UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRANK CAPONE | : | |
|     Plaintiff, | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:06-cv-1249(JCH) |
| | : | |
| | : | |
| ELECTRIC BOAT CORP. | : | |
|     Defendant. | : | May 17, 2007 |

**RULING RE: DEFENDANT'S SECOND MOTION TO COMPEL ARBITRATION (Doc. No. 39) AND SECOND MOTION TO STAY LITIGATION (Doc. No. 41)**

Plaintiff Frank Capone brings this action against the defendant, the Electric Boat Corporation ("Electric Boat"), alleging unlawful discrimination and retaliation in violation of Connecticut General Statutes sections 46-60(a) (1) and 46a-60(a) (4) and the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621 et seq.; negligent infliction of emotional distress; and intentional infliction of emotional distress.

Electric Boat brings this second Motion to Compel Arbitration (Doc. No. 39), as well as a second Motion to Stay Litigation (Doc. No. 41), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, and Section 52-410(a) of the Connecticut General Statutes.

**I.    BACKGROUND**

Capone is a fifty-eight years old resident of Preston, Connecticut. Electric Boat is a corporation established under Connecticut law that operates a submarine manufacturing and overhauling plant in Groton, Connecticut. On December 2, 1982, Capone began working for Electric Boat in Groton as an at-will employee. He is presently a Contract Specialist in the Program Finance Department. At all relevant

times, Capone was not represented by a union.

In July 2001, Electric Boat instituted an alternative dispute resolution policy ("DRP") for its non-union employees. The policy requires all claims covered by the policy to be resolved through a three-step alternative dispute resolution program that culminates in arbitration. The DRP specifies that, "[t]he DRP is the sole and exclusive forum and remedy for all Covered Claims," and that, "[t]he Employee and Company agree to and hereby waive any right to jury trial for any covered claim." DRP at 4, ¶ C (Def. Ex. 56).[1] For current Electric Boat employees with "at will" employment status , the DRP modified that status "to the extent that the Employee shall not be suspended or discharged from employment without just cause as defined herein."[2] Id. at 5 ¶ E. However, the DRP makes clear that, "[e]xcept for the terms of the Policy and the Just Cause Provision, as defined in this section, there shall be no other change in the terms of the Employee's at-will employment status." Id.

The DRP anticipates that both Electric Boat and its employees would agree to be bound by the new policy "[i]n consideration of the DRP and the adoption of the Just Cause Provision." Id. at 5 ¶ F. As to the employee, the DRP further states that "the continuation of employment shall be deemed acceptance of the terms and conditions of the Policy." Id. Generally invoking the FAA, Electric Boat explicitly did not require its

---

[1] Unless otherwise specified, all exhibit citations reference those exhibits submitted by the parties at the April 27, 2007 trial.

[2] According to the DRP, "a suspension or discharge satisfies the 'just cause' requirement when the Employee knew or should have known from Company policy and practice, a warning, or the nature of the conduct, performance, or activity itself, that the conduct, performance or activity giving rise to the suspension or discharge was unacceptable." DRP at 5 ¶ E.

employees to sign any agreement designating their acceptance of the DRP.  Id.

According to Electric Boat, in order to communicate the terms of the DRP to its employees, it: 1) mailed a copy of the DRP to the homes of each Electric Boat employee, along with a letter explaining the program, (Def. Ex. 56); 2) sent a bulletin regarding the implementation of the DRP via intra-company e-mail to each employee's email address, (Def. Ex. 58); 3) posted the DRP on Electric Boat's website, allowing employees to access the policy on their work computers; and 4) distributed bulletins explaining the DRP to employees at Electric Boat's facilities in Groton and Quonset Point, Rhode Island.  On May 9, 2003, Electric Boat notified its employees of an amendment to the DRP.  Electric Boat claims that it sent a Notice of Amendments and copy of the amended DRP to each of its employees through mail, (Def. Ex. 57), email, (Def. Ex. 59) and a posting on the Internet.  The copy of the DRP that Electric Boat sent with the Notice of Amendments included the mandatory arbitration provision discussed above.

On August 31, 2006, Electric Boat filed its original motions to compel arbitration and stay these proceedings (Doc. Nos. 12, 14).  Electric Boat argued that it provided Capone with adequate notice of the DRP's mandatory arbitration requirement and that, by continuing to work at Electric Boat, Capone agreed to the terms of the DRP (Doc. No. 13 at 2).   Capone opposed the motions by arguing that, because he had never received, read, or in any way learned of the DRP before he brought suit, he never consented to the terms of the DRP (Doc. No. 18).

The court denied Electric Boat's motions to compel and stay on the grounds that,

3

by denying receipt of the DRP, Capone had created a material issue as to whether he had notice of the DRP's terms under Connecticut's mailbox rule. Capone v. Electric Boat Corp., 2006 WL 3741116 at *4 (D.Conn. Dec. 19, 2006). Having denied Electric Boat's motions, the court determined, at a February 26, 2007 telephone conference with the parties, (Doc. No. 29), that Capone was entitled to a trial on the issue of arbitrability, pursuant to Section 4 of the FAA. The court subsequently held a bench trial on April 27, 2007, to decide the factual issues of whether and when Capone had notice of the DRP's terms (Doc. No. 49).[3]

Based on the parties's submissions at trial and the record in this case, the court concludes, by a preponderance of the evidence, that Capone had notice of the DRP's terms and accepted those terms by continuing to report to work at Electric Boat. Electric Boat's Second Motion to Compel Arbitration (Doc. No. 39) and Second Motion to Stay the Proceedings (Doc. No. 41) are therefore granted.

## II.    STANDARD

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983). "Any analysis of a party's challenge to the enforcement of an arbitration agreement must

---

[3]This court denied Capone's jury demand on April 11, 2007.

begin by recognizing the FAA's strong policy in favor of rigorously enforcing arbitration agreements." Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157, 162 (2d Cir. 1998).

Typically, "the party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." Tellium, Inc. v. Corning Inc., 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004)(citing Progressive Cas. v. C.A. Reaseguradora Nacional, 991 F.2d 42, 46 (2d Cir.1993)). In determining whether to compel arbitration pursuant to the FAA, a court looks to four factors: 1) whether the parties agreed to arbitrate their dispute; 2) whether the asserted claims fall within the scope of the arbitration agreement; 3) whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-arbitrable, and 4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the remaining claims pending arbitration. Morales v. Rent-A-Center, Inc., 306 F.Supp.2d 175, 179 (D.Conn. 2003) (citing Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir.1987)). Only the first factor is relevant to this court's decision.

To decide whether a valid arbitration agreement exists, the court looks to the "ordinary state-law principles that govern the formation of contracts" under the law of the state governing the contract. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). In this case, the parties agree that Connecticut law governs.

### III.    DISCUSSION

####    A.    Capone's Notice of the DRP

The court concludes that, before filing this lawsuit, Capone received notice of the

5

DRP.  In so concluding, the court relies on its findings that Capone received three Electric Boat's mailings to his home containing the DRP and that Electric Boat specifically informed Capone that the DRP required him to forego a judicial forum via a August 31, 2004 letter from an Electric Boat employee.  The court discusses the bases for these two findings in turn.

With respect to Capone's receipt of Electric Boat mailings, Connecticut's Mailbox Rule "provides that a properly stamped and addressed letter that is placed into a mailbox or handed over to the United States Postal Service raises a rebuttable presumption that it has been received."  Echavarria v. Nat'l Grange Mutual Ins. Co., 275 Conn. 408, 418 (2005) (citing 29 Am.Jur.2d, Evidence § 262 (1994)).  The court finds that Electric Boat has raised such presumption with its July 25, 2001 letter informing Capone and other Electric Boat employees about the DRP, with its May 9, 2003 letter informing Capone and other Electric Boat employees about changes in the DRP, and with its 2005 mailing of the Employee Handbook to Electric Boat employees.  Both documents enclosed a copy of the DRP and the mandatory arbitration clause at issue.

According to Cheryl J. Stergio, Electric Boat's Manager of Equal Employment Opportunity/Affirmative Action, Electric Boat properly stamped and mailed these letters to Capone's home address.  Stergio Aff. ¶ 3-4 (Def. Ex. 1 to Doc. No. 19).  For the 2001 and 2005 mailings, Electric Boat conducted a "Tab Run," which is computer program that tracks all individuals to whom Electric Boat sent mail and logs whether any mail was returned as undeliverable.  See Id. ¶ 5; Electric Boat 2001 Tab Run (Def. Ex. 73); Electric Boat 2005 Tab Run (Def. Ex. 74).  The uncontested evidence shows that

6

Electric Boat never received notice that mailings to Capone's home address were undeliverable. Further, Capone's address has not changed at any point relevant to this case.

It is also clear from the record that Capone received from Electric Boat other mailings unrelated to the DRP. Pursuant to a discovery request from Electric Boat and an Order of this court (Doc. No. 30), Capone produced a June 12, 2002 letter from Electric Boat concerning the company's Equal Employment/Affirmative Action policies (Def. Ex. No. 68), and five W-2 Statements from Electric Boat for the years 2002-06 (Def. Ex. Nos. 51-55). See Capone Depo. Tr. at 13 (undocketed). Capone also admits receiving at his home address notices concerning his health benefits. Id. at 17-19.

To rebut the presumption that he did receive a copy of the DRP at his home address, Capone points to the fact that, in the approximately twenty-seven years he has lived at his current home address, he has experienced mailbox vandalism about once per year on average. Id. at 26. However, on those occasions when someone vandalized his mailbox, the post office held the mail rather than deliver it. Id. at 29-30. Capone offers no evidence that he failed to receive mail as a result of vandalism or otherwise. The court finds that Capone has not rebutted the presumption that he received the 2001, 2003, and 2005 mailings from Electric Boat containing the mandatory arbitration provision. Consequently, the court presumes that Capone received these mailings at his home address.

Despite the court's finding that Capone received Electric Boat's mailings concerning the DRP, mere receipt would not constitute notice of the DRP if the mailings

themselves insufficiently apprised Capone of the DRP's existence.  See Whitaker v. Clear Channel Broadcasting, Inc., 2005 WL 3478352 at *5 (D.Conn. Dec. 19, 2005) (declining to find an agreement to arbitrate where signed offer letter did not reference arbitration agreement or notify employee that she was obligating herself to terms contained in a separate Employee Guide).  Citing to case law from the First Circuit, Capone asserts that Electric Boat was required to afford its employees "some minimal level of notice sufficient to apprise these employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum."  Campbell v. General Dynamics Gov. Sys. Corp., 407 F.3d 546, 555 (1st Cir. 2005).  To this end, Capone argues that Electric Boat failed to provide a minimal level of notice because none of the notices Electric Boat provided explicitly stated that the DRP effected a waiver of an employee's right to a judicial forum for certain employment complaints (Doc. No. 18 at 4).

Based only on the content of Electric Boat's mailings to Capone, the court might be persuaded that Electric Boat did not adequately alert Capone to effects of the DRP on Capone's right to pursue employment claims in a judicial forum.  None of the mailings even references the mandatory arbitration clause.  Indeed, one could certainly argue that the July 25, 2001 letter attempts to mask any harmful effects the DRP might have on employee rights to judicial resolution.  The letter characterizes the DRP as an attempt to "enable employees to express more freely and effectively their concerns . . . ."  Def. Ex. 56.  Though the letter outlines the steps involved in arbitrating a dispute, no where does Electric Boat even hint that this process is intended to replace civil

actions. Id. ("the DRP will provide three steps to resolve the issue . . . "). Most tellingly, while the DRP purports to enhance employee's job security by implementing a just cause termination and suspension requirement, it is completely silent on the fact that this boon in job security comes only in exchange for the employee's waiver of a significant procedural right. See id. Such failure to notify employees of the consequences of an arbitration agreement severely undermines any argument that the parties agreed to arbitrate. Compare Sherry v. Sisters of Charity Medical Center, 1999 WL 287738, at *5 (E.D.N.Y. May 4, 1999) (declining to enforce arbitration clause where mandatory arbitration clause not specifically referenced in materials provided) with Maye v. Smith Barney, Inc., 897 F.Supp. 100, 107 (S.D.N.Y.1995) (finding that employees' signatures to document entitled "Principles of Employment" that specifically referenced arbitration agreement put the employees "on notice" as to the existence of an agreement).

However, the court finds that, notwithstanding the inadequacy of Electric Boat's aforementioned mailings, the court has little doubt that Capone was aware of and read the DRP. On July 28, 2004, Capone filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging age discrimination. Stergio responded to Capone's CHRO complaint on August 31, 2004 with a letter stating that "[u]nder [the DRP] you retain the right to file such charges, but to the extent that you wish to pursue the matter outside CHRO, the DRP requires that you pursue relief exclusively through the DRP." Def. Ex. 61. At the deposition concerning Capone's notice of the DRP, Capone had the following exchange with defense counsel:

Q:   Tell me, when was the first time that you saw a dispute resolution policy?

> A: When Cheryl Stergio responded to a letter saying that I should have been using the dispute resolution policy after I had started the lawsuit already . . .
>
> Q: That was the first you knew that there was a dispute resolution policy?
>
> A: To the best of my recollection, yes.
>
> Q: At the time that she sent that letter did you read the dispute resolution policy?
>
> A: Oh, yes.

Capone Dep. Tr. at 33. Later in the deposition, defense counsel followed up on Capone's response as follows:

> Q: So would it be fair to say that at the end of August 2004, or, at the latest, beginning of September 2004 you were aware of an Electric Boat dispute resolution policy?
>
> A: Yes.
>
> Q: And after you read Electric Boat's dispute resolution policy did you continue to be employed -- remain employed at Electric Boat?
>
> A: Yes . . .
>
> Q: And let me ask you, once you received the letter which references an Electric Boat dispute resolution policy how did you actually review the document, did you go on-line to review it or did you look at a hard copy?
>
> A: I went on-line

Id. at 55. After Capone provided this last answer, his attorney requested a break. Id.

Capone's deposition testimony on March 9, 2007 clearly establishes that Capone had notice of and read the DRP. A month later, however, Capone submitted a Correction Page to supplement his deposition testimony. Def. Ex. 77. Where Capone responded "yes" when asked if he continued to work at Electric Boat after reading the

10

DRP, Capone sought to change his answer to "Yes I looked at the policy but did not read it."  Id.  Considering the context of the question, Capone's amended response is nonsensical.  If Capone intended for the correction to suggest that he did not read the DRP, the correction could simply read, "No."  In its current form, Capone's correction is not responsive to the question posed.

Capone also corrected his statement that "I went on-line" to read instead, "I went on-line and identified the document but did not become familiar with it."  Id.  This correction appears to contradict Capone's earlier, uncorrected testimony, during which he responded "Oh, yes" when directly asked if he read the DRP after receiving Stergio's letter.  Capone Dep. Tr. at 33.  Capone's later responses strongly suggest that he only accessed the DRP through Electric Boat's intranet system, since Capone stated that he went "on-line" when asked how he reviewed the DRP.  See id. at 55.  Unless Capone read the DRP in another form besides the "on-line" version, a possibility that cannot be conclusively precluded from his deposition testimony, it seems inconsistent for Capone to testify both that he read the DRP, but that he did not become familiar with it.

Furthermore, the court finds it significant that Capone did not seek to correct his deposition testimony until after the parties' final pre-trial conference on April 2, 2007. During that conference, the court passingly suggested, without deciding, that Capone's ability to resist arbitration may have been strengthened had he testified that he did not read the DRP in full.  The timing of Capone's corrections, and the seemingly inherent inconsistencies contained therein, appear to be an attempt to create an issue where one previously did not exist.  This consideration bears negatively on the court's assessment of Capone's credibility.

11

At trial, Capone maintained that, while he looked at the DRP on Electric Boat's intranet system, he never actually read the DRP. Based on the evidence, the court does not credit Capone's assertion that he never read the DRP, and it finds by a preponderance of the evidence that Capone did, in fact, have notice of the DRP's terms.[4]

B. **Capone's Acceptance of the Terms of the DRP**

Under the FAA, "a party may be bound by an agreement to arbitrate absent a signature." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987); see also Thompson-CSF S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776-77 (2d Cir. 1995). Furthermore, where an individual's employment is at will, continued employment is sufficient consideration to render an arbitration agreement binding. Comfort v. Mariner Health Care, Inc., 2005 WL 977062, * 2 (D.Conn. April 26, 2005) (citing Fahim v. Cigna Investments, Inc., 1998 WL 1967944, *2 (D.Conn. 1998). Because Capone, an at-will employee in all respects before he received notice of the

---

[4]The court also notes that Capone's deposition testimony that he was aware of the DRP directly contradicts two of Capone's statements in his sworn affidavit, filed on October 24, 2006 in opposition to Electric Boat's original motions to remand and stay. The pertinent paragraphs read as follows:

¶ 12: Further, it has come to my attention that Electric Boat Corporation claims to have posted the DRP policy on Electric Boat's "intranet" system. I did not see this posting on the intranet system.

¶ 17: I had no knowledge of the DRP program existing and had no knowledge of its substance. I was surprised to learn through the pending litigation that such a system existed . . . This was never stated or explained to me in any form by management or anybody at Electric Boat.

Def. Ex. 72. Capone's statements were central to the court's ruling that he had created a material issue of fact on arbitrability, and provided the basis upon which this court decided to conduct a hearing on the issue of notice.

DRP,[5] continued to report to work after receiving notice of and reading the terms of the DRP, the court finds that an agreement to arbitrate existed between Capone and Electric Boat. The court therefore grants Electric Boat's Second Motion to Compel (Doc. No. 39) and Second Motion to Stay (Doc. No. 41).

IV.     **CONCLUSION**

For the foregoing reasons, Electric Boat's Second Motion to Compel (Doc. No. 39) is GRANTED. The clerk is directed to administratively close the case. Electric Boat will have the right to re-open this case if further action by the court is necessary after arbitration. Electric Boat's Second Motion to Stay (Doc. No. 41) is denied as moot.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 17th day of May, 2007.

       /s/ Janet C. Hall
       Janet C. Hall
       United States District Judge

---

[5] Electric Boat retained significant authority to alter the DRP and other terms and conditions of employment for its employees. Def. Ex. 56 at 6, ¶ J.